IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 31, 2023

## IN RE FREDDY P.

**Appeal from the Chancery Court for Greene County**
**No. 2021-CV-199   Douglas T. Jenkins, Chancellor**

_____

## No. E2023-00042-COA-R3-PT

_____

The trial court denied a petition for termination of parental rights as to Mother, despite finding two grounds for termination, based on petitioner's failure to establish that termination was in the best interest of the child. Petitioner appeals the trial court's determination that a third ground for termination was not found, as well as the finding that termination was not in the best interest of the child. Based on the record before us, we (1) affirm the denial of failure to visit; (2) affirm the finding of failure to support; (3) reverse the finding of persistence of conditions; and (4) affirm the finding that terminating Mother's parental rights is not in the best interest of the child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed**
**in Part; Affirmed in Part; and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which ARNOLD B. GOLDIN, and KENNY ARMSTRONG, JJ., joined.

Curt Collins, Greeneville, Tennessee, for the appellant, Ashley F.

Douglas L. Payne, Greeneville, Tennessee, for the appellees, Freddy P. and McKayla P.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

On May 20, 2021, Petitioner/Appellant Ashley F.[1] ("Appellant") filed a petition in the Greene County Chancery Court ("the trial court") for the termination of the parental

---

[1] In cases involving the potential termination of parental rights, it is this Court's policy to remove the full names of children and other parties, to protect their identities.

rights of Respondent/Appellee McKayla P. ("Mother") and Respondent Freddy P. ("Father" and, together with Mother, "the parents") to the minor child Freddy P., born in June 2017.[2] As grounds for termination, Appellant alleged abandonment by failure to visit or support, persistence of conditions, and failure to manifest an ability and willingness to assume custody.[3] Appellant alleged that termination of Mother's rights was in the child's best interest and also petitioned for adoption.

Attached to the petition were two orders from the Juvenile Court for Greene County ("the juvenile court"). In February 2019, pursuant to an emergency petition by Mother's mother and stepfather (together, "Mother's parents"), the child was placed in the joint legal custody of Mother's parents and Appellant, with Appellant maintaining physical custody.[4] Mother was granted weekly phone calls and supervised visitation, to be amended to unsupervised upon the recommendation of a therapist. Then in October 2019, Appellant was granted sole legal custody of the child. The juvenile court's order indicated that a motion by Mother for unsupervised visitation was denied, and that Mother needed to complete intensive therapy and follow all recommendations prior to petitioning for increased visitation or custody of the child.[5]

In relation to the termination petition, Mother filed an answer in the trial court in June 2021, denying all allegations as to grounds, best interest, and that Appellant was fit and financially able to adopt the child. Mother amended her answer in November 2021, raising a lack of willfulness as to any purported failure to visit. Mother also filed a motion to enforce the visitation schedule established by the juvenile court, which the trial court granted by agreed order. A guardian ad litem ("the GAL") for the child was appointed.

The trial court heard this matter on August 30, 2022. Appellant called three witnesses: the child's therapist, Mother, and herself. The child's therapist testified that the child began receiving treatment in June of 2022, in part to provide support for the child regarding the potential upcoming changes to his custody arrangement. The therapist noted that the child calls Appellant "Mom" and opined that Appellant and the child had "a healthy mother/son relationship." She testified that at the one session where Mother was present, the child was happy to see Mother but his play was "a bit more destructive" than usual based on the tension of the situation. At that visit, Mother brought the child a toy, a pair of

---

[2] Appellant does not raise the trial court's decision to not terminate Father's rights as an issue on appeal. Therefore, his involvement in this matter will be discussed only as necessary.

[3] The ground of failure to manifest an ability or willingness to assume custody was not addressed at the final hearing or in the trial court's final order.

[4] Pursuant to the same proceedings in the juvenile court, Mother's older child from an earlier relationship was also removed from her custody and placed in the custody of that child's father. This appeal does not involve Mother's parental rights to the older child, so we will discuss the details of that child's custody only as necessary.

[5] Mother filed a petition for return of custody in the juvenile court in May 2021, prior to Appellant's termination petition.

shoes, and a couple items of clothing. Although the child did not refer to Mother as "Mom," he understood that when the therapist referred to "Mom," she meant Mother. The therapist opined that the relationship between Mother and the child was warm, loving, and playful, but more like playmates than mother/son.

Mother explained that the conditions leading to the petition in the juvenile court involved the parents' financial and housing instability, including difficulties maintaining utilities in the home, as well as drug use and emotional domestic abuse by Father towards Mother. Mother explained that the juvenile court's conditions for her to gain unsupervised visitation related to her completion of intensive therapy. Mother's testimony was that she had seen a therapist for a few months but admitted that she did not complete a clinical assessment or intensive therapy. Mother testified that she received some counseling in 2018 and 2019 but did not receive any recommendations. Mother then attended more counseling in 2021. Mother received no recommendations, in part because the therapist felt that doing so was outside the scope of her employment.

Mother testified that she lived in multiple places during the custodial period and was currently residing with a roommate and her child in Greene County. Mother also had multiple vehicles during the custodial period but testified that she was without a vehicle from January 2022 through shortly before the hearing. When she was without a car, Mother was driven to visitation by a third party; Appellant drove Mother home a few times after visits. Mother was employed during the entirety of the custodial period and now works as a waitress making approximately $600.00 per week. She explained that Tennessee regulations would not allow her to work in a hospital with the Registered Medical Assistant degree she received in Florida, so the pay was substantially less, leading her to seek other types of employment. Mother's testimony reveals that she generally retains less than $500.00 per month after her monthly expenses.

Mother admitted that she knew that she had an obligation to financially support the child but she did not provide Appellant with any monetary support for the child since the custodial period began. Mother explained that while the child was still in diapers she provided "diapers quite frequently," and "big old packs of wipes" before switching to buying underwear as the child aged. She testified that she brought the child toys on birthdays and holidays and at other times. Mother also explained that she asked Appellant if the child needed anything on multiple occasions and that Appellant would respond that she had everything and the child was fine.

Mother did not have an independent recollection of the exact dates of her visits or how many visits she scheduled, cancelled, or completed during the custodial period, but she was able to create an approximate visitation timeline for discovery purposes from her text messages and the notes she kept. Mother testified to thirty-seven visits with the child in 2020. Mother had one visit with the child in January 2021 before Appellant tested positive for COVID-19 and visitation was paused based on quarantine precautions. There

appears to have been some confusion or miscommunication about when Appellant and the child would be able to resume visitation with Mother, but there was no contact between Mother and either Appellant or the child between February 8, 2021 and April 26, 2021. Mother testified that she became worried that if she continued to press Appellant to schedule visitation, Appellant was going to start taking steps to gain full custody of the child. Mother explained that she was not in a position to be able to regain custody of the child at that point so she spent this time working and preparing for the child to be returned to her custody.[6] Visitation resumed in July 2021, after Mother filed a motion to enforce the juvenile court's visitation schedule. Mother testified that she had seventeen visits in the remainder of 2021, and then fifteen visits from January through August of 2022. Although Mother was entitled to weekly phone calls, she did not have many calls because it was difficult to keep the child interested; Mother did have video calls with the child on occasion. Mother testified that she and the child "have a very decent bond" and play together. According to Mother, the child acts differently when not around Appellant: though he will tell Mother he loves her and call her "Mom" when the two are alone, when Appellant is present the child will tell Mother he does not love her. Mother testified that she feels that her relationship with Appellant is more "hostile," with her "fighting tooth and nail" with Appellant, who does not want the child around his biological family.[7] Mother testified to her concerns of Appellant's treatment of the child, providing photos of times where the child's skin was dry and cracking, his nails were overlong and breaking, and he had bruises, scrapes, and gashes. Mother called DCS in March 2022 in relation to these concerns. Mother also raised concerns about the number of men being introduced to the child by Appellant.

Mother testified that she had not had any contact with Father since May 2022. She

---

[6] Specifically, Mother's testimony was as follows:

> I was afraid that if I was to push the matter [of visitation] in February that it would have, I would have been at a disadvantage simply for the fact of I just moved, [Father] was still [living] with me at the time. And, so, and I knew that I didn't have anything that I needed for my son to come home if I was to pursue the full custody. So, what I had did during those months is buy clothes for him for him to be able to come home, if that was the thing. I bought his car seat. I bought a bed. I saved money up. And I worked continuously to be able to hire a lawyer and file for the returned custody.

> . . . .

> I wasn't fearful that [Appellant] was going to deny me the visitation. I was fearful that she was going to start the process of taking him away. And I was not prepared to fight for that at that particular time.

[7] Mother explained that after the juvenile court placed the custody of the child with Appellant and the custody of her older child with that child's father, Appellant and the older child's father began a relationship, during which the child and his sibling lived together. When the relationship ended, Appellant refused to allow the child to be around Mother's older child, which included cancelling visits if the older child was with Mother.

explained that she and Father are separated but still married, due in part to Mother's focus being on regaining custody of her children and her desire to ensure that Father would not be involved in anything to do with the child. Mother admitted that she was not in a position to regain custody of the child from September 2019 through May 2021.

Appellant explained that she kept a real-time log of Mother's visitation, which was included as an exhibit. The log showed that Mother visited thirty-five times in 2020, once in the four months prior to the May 2021 termination petition, twelve times in the remainder of 2021, and eight times in 2022 prior to trial. Appellant admitted that she unilaterally restricted visitation around May 2021, in violation of the juvenile court's order. Appellant testified that she was concerned because Mother was not consistent with her visitation or effort towards maintaining a relationship with the child. Appellant testified that Mother did not provide monetary support for the child during the custodial period, but that Mother brought the child clothes for birthdays and holidays four times.

Appellant also expressed concern with Mother's stability, noting that Mother moved multiple times and had periods where she did not have her own car and needed to borrow someone else's or be driven to visitation. Appellant described her perception of the permanency of Mother's housing as "the same with boyfriends that I have. You have a fallout, you move out." Appellant admitted that she could see how introducing the child to multiple men could be a cause for concern, particularly as the child has called more than one of Appellant's partners "Dad." In 2022, the child had been around only one paramour, whom Appellant has known for several years. Appellant explained that she and her mother are the child's primary caregivers, with the child occasionally left alone with a serious boyfriend.

Appellant lived primarily with her father before he passed away in 2019; she currently lives with her mother. Appellant owns two cars and a plot of land. Appellant had heart surgery in 2020.[8] As a result, Appellant went on medical leave from the job she has had for years. Appellant returned to the job for a few months before taking medical leave again in early 2021, to accommodate the custody process. Appellant is taking classes to be an in-home nurse for her grandfather. She is currently providing in-home care for a local elderly woman and cleaning houses to earn income, but she hopes to return to her previous long-term employment as a welder. Appellant did not specifically testify to her income, but stated that "[a]ll" of her money "goes to bills and [the child]." Appellant's mother also shares in the household bills.

Appellant explained that she has had custody of the child since she was twenty-one years old, describing the child as her "top priority from Day One." Appellant testified that, should Mother's rights be terminated, she would be willing to allow Mother around the child eventually.

---

[8] Appellant testified that she currently has no restrictions resulting from her heart problems.

Three witnesses testified for Mother. The first described an incident in early 2022 where Appellant's current paramour accidentally discharged a handgun in a vehicle, with the child and another child in the car. Appellant had testified that the children were not in the car but only nearby, and that the witness had not been around until after a tow truck was called to remove the vehicle. The second witness, who was previously friends with Appellant, explained that she babysat the child multiple times, including for approximately two weeks in 2019 after Appellant's father died. She explained that the child would often scream and cry at the prospect of returning to Appellant's home. The witness testified that Appellant would occasionally drive with the child not in a car seat, that Appellant had once aggressively physically punished the child in her presence, and that Appellant neglected to trim the child's nails for fear of cutting him. The witness also testified that Appellant would correct the child when he called Mother "Mom," insisting that she, Appellant, was "Mommy" and Mother was "McKayla." The third witness, Mother's sister and prior longtime friend of Appellant, testified that Mother had matured over the past three years and "done everything in her power" to regain custody of the child.

The trial court issued an oral ruling after the close of proof. The trial court determined that there was sufficient visitation to avoid a finding of failure to visit. As to failure to support, the trial court found that, although Mother was consistently working, she did not provide even token support during the four months prior to the filing of the termination petition. Finally, the trial court found that all of the elements of the ground of persistence of conditions had also been proven by clear and convincing evidence. However, the trial court found that termination of Mother's parental rights was not in the best interest of the child because, after a comparison "of subtle little things, and some not so subtle, . . . [termination] just worries [the trial court] that the significant rights that a person has under the Constitution were terminated to put the child in a very similar situation." Thus, judgment was entered for Mother and Appellant's petition was dismissed. The trial court's September 12, 2022 order included a transcription of its ruling from the bench.

Appellant filed a "motion to reconsider" as to Mother's rights on October 3, 2022, alleging that Mother had lied about her housing. Mother responded, denying that she had lied about a change in her living arrangements and arguing that "the disparity between the living arrangements of the parties was not a factor that supported the termination." By order of December 16, 2022, the trial court denied the motion to reconsider, finding that the change in Mother's housing did not warrant an amendment or modification of its judgment.[9] Appellant filed a timely notice of appeal.

## II. ISSUES PRESENTED

---

[9] Pursuant to Appellant's motion for clarification as to Father's rights, the trial court also ruled that although Appellant would generally be entitled to a default judgment against Father based on his lack of participation in this case, Father's rights to the child would not be terminated, "pending resolution of this case by the Tennessee Court of Appeals."

Appellant raises the following issues, taken from her brief with minor alterations:

1. Did the trial court err as a matter of law in finding that Appellant did not prove, by clear and convincing evidence, that Mother willfully abandoned the child by engaging in token visitation pursuant to Tenn. Code Ann. §§ 36-1-102(1)(A)(i) and 36-1-113(g)(1)?

2. In consideration of the best interest factors set forth in Tenn. Code Ann. § 36-1-113(i), did the trial court err as a matter of law in finding that termination of Mother's parental rights was not in the best interests of the child, especially considering that the trial court determined that Mother had demonstrated an inability to make an adjustment in circumstance in order to provide a safe and stable environment for the child?

## III. STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016) (collecting cases). In Tennessee, termination of parental rights is governed by statute, which identifies "situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). "[P]arents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." *In re Carrington H.*, 483 S.W.3d at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." *Id.* at 522 (citation omitted); *accord In re Addalyne S.*, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018) ("Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases.").

Thus, a party seeking to terminate a parent's rights must prove by clear and convincing evidence (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Carrington H.*, 483 S.W.3d at 522. The standard "ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005)). Because of the high standard of proof in termination cases, the standard of review is somewhat different than our typical standard under Rule 13 of the Tennessee Rules of

Appellate Procedure. As the Tennessee Supreme Court recently explained:

> To review trial court decisions, appellate courts use a . . . two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Justice A.F.*, 2012 WL 4340709, at *7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).
>
> Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re Justice A.F.*, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *see also In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d [240,] 246 [Tenn. 2010)].

*In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023).

### IV. ANALYSIS

As an initial matter, we must discuss our subject matter jurisdiction to hear this case. Being an appellate court, we typically have jurisdiction only after a final judgment has been entered. Tenn. R. App. P. 3(a); s*ee also Foster-Henderson v. Memphis Health Center, Inc.*, 479 S.W.3d 214, 222 (Tenn. Ct. App. 2015). *But see generally* Tenn. R. App. P. 9; Tenn. R. App. P. 10. "A final judgment is one that resolves all the issues in the case, 'leaving nothing else for the trial court to do.'" *In re Est. of Henderson*, 121 S.W.3d 643, 645 (Tenn. 2003) (quoting *State ex rel. McAllister v. Goode*, 968 S.W.2d 834, 840 (Tenn. Ct. App. 1997)). Here, the trial court's language that its determination as to Father was entered pending resolution by this Court gives us pause as to the finality of its judgment. In other words, the trial court's order is largely unclear as to whether a final judgment was entered as to Father, the second respondent in this case. Neither the order on the motion to

reconsider or the order on the motion for clarification contained the language within Rule 54.02 of the Tennessee Rules of Civil Procedure, designating the judgment as final. *See* Tenn. R. Civ. P. 54.02(1) ("When more than one claim for relief is present in an action, . . . the Court . . . may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment."). Pursuant to Rule 2 of the Tennessee Rules of Appellate Procedure, however, we are able to waive the finality requirement for good cause. *See* Tenn. R. App. P. 2 ("For good cause, including the interest of expediting decision upon any matter, the . . . Court of Appeals . . . may suspend the requirements or provisions of any of these rules in a particular case . . . or on its motion and may order proceedings in accordance with its discretion[.]"). As the stability of a child's future is involved, and in the interest of judicial economy, particularly where we affirm the trial court's determination that termination of Mother's parental rights was not warranted, *infra*, we find that good cause exists to exercise jurisdiction over this matter.

## A. Grounds for Termination

Appellant argues that the trial court erred by not finding the ground of abandonment by failure to visit had been proven by clear and convincing evidence. Instead, the trial court found that only two grounds supported terminating Mother's parental rights: abandonment by failure to support and persistence of conditions. These findings have not been appealed. And Mother, in the posture of appellee, does not dispute these findings. Although only one ground need be proven by clear and convincing evidence for a parent's rights to be subject to termination, "the Tennessee Supreme Court has instructed this Court to review each ground relied upon by the trial court to terminate parental rights in order to prevent 'unnecessary remands of cases.'" *In re Bobby G.*, No. E2021-01381-COA-R3-PT, 2022 WL 2915535 (Tenn. Ct. App. July 25, 2022) (quoting *In re Angela E.*, 303 S.W.3d at 251 n.14); *see also In re Carrington H.*, 483 S.W.3d at 525–26 (holding that "in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal"). We therefore review all three grounds in turn.

### 1. Abandonment

Tennessee Code Annotated section 36-1-113(g)(1) provides that abandonment by a parent is a ground for the termination of parental rights and, in turn, Tennessee Code Annotated section 36-1-102 defines the term "abandonment." Under the version of that section in existence at the time the petition was filed, as relevant to this appeal, abandonment was defined as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a . . . petition to terminate the parental rights of the parent . . . of the child

who is the subject of the petition for termination of parental rights or adoption, that the parent . . . either [has] failed to visit or [has] failed to support or [has] failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i).[10] The section further provides that a failure to visit consists of "the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation[.]" Tenn. Code Ann. § 36-1-102(1)(E). "Token visitation" is defined as visitation that, "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]" Tenn. Code Ann. § 36-1-102(1)(C). Similarly, a failure to support involves "the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). When the provided support, "under the circumstances of the individual case, is insignificant given the parent's means[,]" it is considered token. Tenn. Code Ann. § 36-1-102(1)(C). The parent's abandonment within the relevant four-month period may not be rectified by resuming visitation or support subsequent to the filing of a termination petition. Tenn. Code Ann. § 36-1-102(1)(F). Here, the four-month period at issue spans from January 20, 2021 through May 19, 2021.[11] We proceed to consider both types of abandonment alleged in this case: failure to visit and failure to support.

### a. Failure to Visit

The trial court found that Appellant had not established a failure to visit by clear and convincing evidence. From our review, Mother's visitation with the child during the relevant four-month period would generally be considered "token" within the meaning of Tennessee Code Annotated section 36-1-102(1)(C). The parties agree that Mother visited only once in January 2021 before a seventy-five-day period of no contact with either the child or Appellant. *See **In re Justin N.**,* No. E2022-01603-COA-R3-PT, 2023 WL 8272174, at *7 (Tenn. Ct. App. Nov. 30, 2023) (collecting cases).

In her amended answer to Appellant's termination petition, Mother raised the affirmative defense of a lack of willfulness as to the alleged failure to visit. A parent may raise as an affirmative defense that the failure to perform more than token visitation was not willful. Tenn. Code Ann. § 36-1-102(1)(I). In that case, the parent bears the burden of proving the absence of willfulness by a preponderance of the evidence. ***Id.*** Willfulness in

---

[10] Throughout this Opinion, we cite to the statutes that were in place at the time the termination petition was filed in May 2021.

[11] "The applicable four month window . . . includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed." ***In re Jacob C.H.**,* No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014).

terms of parental rights "does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will." ***In re Audrey S.***, 182 S.W.3d at 863. (citations omitted). Instead, "a person acts 'willfully' if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing." ***Id.*** at 863–64. Thus, a parent's failure to visit is willful when it is "the product of free will, rather than coercion"; accordingly, such failure "is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child." ***Id.*** at 864 (first citing ***In re Adoption of Lybrand***, 329 Ark. 163, 946 S.W.2d 946, 950 (1997); and then citing ***In re Serre***, 77 Ohio Misc. 2d 29, 665 N.E.2d 1185, 1189 (1996); ***Panter v. Ash***, 177 Or. App. 589, 33 P.3d 1028, 1031 (2001)).

Here, it does appear that some of the lack of visitation was based on factors outside of Mother's control. Indeed, there were several messages between the parties in early January 2021, regarding Appellant's COVID-19 status and the fact that Appellant and the child would be quarantining together. On January 23, when Appellant said that she was feeling better and that the child had never tested positive, Mother asked about starting visitation back up. Appellant explained that she had taken a second test, but that she had still been positive and her resulting quarantine period would not be complete until February 3. Mother asked about Appellant's third testing on February 8, and after a back-and-forth about the child's testing status, Appellant did not provide an answer as to her own. Mother then messaged Appellant on April 26, 2021, explaining that she had been trying to get her life together, including housing and finances, and had experienced some medical issues. Mother requested to restart visitation. Appellant was initially receptive to finding a time that worked for them both. Mother asked again about scheduling a visit on April 30, May 1, and May 2. At this point, after expressing her opinion on Mother's involvement with the child, Appellant told Mother:

> "I'm not gonna cater [to] you or try to move and open our schedule for you. As of right now [y]ou should probably go talk to someone or something and make sure all of your stuff is in order like I have because walking in and out for months on him isn't gonna happen anymore."

Mother filed a petition to enforce the juvenile court's visitation schedule in June 2021 and visitation resumed in July 2021.

Thus, while some part of the lack of visitation was admittedly based on Mother's attempts to sort out her living arrangements, finances, and medical issues, a significant part was also based on Appellant's own medical situation and Appellant's unilateral decision to deny Mother visitation in violation of the juvenile court's order. Thus, Appellant's conduct did "actually prevent[]" Mother from performing her duty to visit, and "amount[]" to a significant restraint of or interference with [Mother's] efforts to . . . develop a

relationship with the child." ***In re Audrey S.***, 182 S.W.3d at 863 (citations omitted). And, importantly, whether visitation is "token" under section 36-1-102(1)(C) "is a fact-intensive inquiry to be decided on a case-by-case basis." ***In re Keri C.***, 384 S.W.3d 731 (Tenn. Ct. App. 2010). We agree with the trial court's assessment that "maybe this same amount of visitation might be token in another case." But, we also agree that, in this particular case, Mother presented sufficient evidence that her failure to visit during this time period was not willful. So the trial court's ruling as to this ground is affirmed.

### b. Failure to Support

As to abandonment by failure to support, there is no dispute that Mother provided no financial support for the child at any point during the custodial period, despite being consistently employed. Although the parties disagree as to how often or significant Mother's provision of support in kind was, the difference in their testimony has little impact on our determination that her support in kind was no more than "token" under Tennessee Code Annotated section 36-1-102(1)(C). *See, e.g.*, ***In re Kierani C.***, No. W2020-00850-COA-R3-PT, 2021 WL 4057222, at *15 (Tenn. Ct. App. Sept. 3, 2021) (finding father provided only token support after providing $27.00 in cash support and giving gifts consisting of clothing, toys, or food items on seven occasions); ***In re Braxton M.***, 531 S.W.3d 708, 721 (Tenn. Ct. App. 2017) (finding token support where during the relevant period father only provided gifts at one Christmas and maybe some clothing); ***In re Hailey S.***, No. M2015-00842-COA-R3-PT, 2016 WL 3209444, at *11 (Tenn. Ct. App. May 31, 2016) ("In this case, [f]ather never paid child support, other than token support or small gifts, throughout the entirety of the [c]hild's lifetime even when he was admittedly capable of working and actually employed at various times."). Mother did not raise the affirmative defense of a lack of willfulness in regard to her failure to support the child. Accordingly, we affirm the trial court's finding that this ground supported termination of Mother's parental rights.

### 2. Persistence of Conditions

The trial court also terminated Mother's parental rights on the ground commonly known as "persistence of conditions." This ground applies when:

> The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> > (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe

return to the care of the parent or guardian;
(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3)(A).[12] The six-month removal period "must accrue on or before the first date the termination of parental rights petition is set to be heard." Tenn. Code Ann. § 36-1-113(g)(3)(B). Based on the statute's introductory language, a threshold condition for the application of this ground is that the child was (1) removed from the home or custody of the parent, (2) for at least six months, (3) pursuant to a juvenile court order, (4) entered in a proceeding wherein a petition alleged the child was dependent and neglected.

We have previously held that "[t]he submission into evidence of a certified copy of the court order which removed the children from Mother's home would have been sufficient proof" of this prerequisite. *State Dep't of Children's Servs. v. D.W.J.*, No. E2004-02586-COA-R3-PT, 2005 WL 1528367, at *4 (Tenn. Ct. App. June 29, 2005). That case looked to a prior version of the statute that was later determined to be applicable only if the child was actually adjudicated to be dependent, neglected, or abused. *See In re Audrey S.*, 182 S.W.3d 838, 874 (Tenn. Ct. App. 2005) (holding, after its review of the 2004 supplement to the 1995 enactment of section 36-1-113(g), that persistence of conditions "applies as a ground for termination of parental rights only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse"). The statutory language has since been updated to contemplate a child's removal based solely on allegations of dependency and neglect. Still, this aspect of the ground is typically discussed when the record does not contain a juvenile court order removing the child from the parent's home or custody. *See In re Emma F.*, No. E2021-00852-COA-R3-PT, 2022 WL 576827, at *4 (Tenn. Ct. App. Feb. 25, 2022) (reversing ground where the record did not contain the order of removal); *In re Allie-Mae K.*, No. M2020-00215-COA-R3-PT, 2020 WL 6887870, at *12 (Tenn. Ct. App. Nov. 24, 2020) (reversing ground where the record contained the order finding children dependent and neglected, but no order removing the children from the parents' home or custody and the children had been placed with relatives prior to entering state custody).

Here, there is no question that the child had been removed from Mother's home or

_____

[12] The introductory language to this ground has since been updated to require that "[t]he child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a *child is alleged to be* a dependent and neglected child[.]" Tenn. Code Ann. § 36-1-113(g)(3)(A) (2023) (emphasis added).

- 13 -

custody for a period of longer than six months pursuant to a juvenile court order. Indeed, the juvenile court's February 2019 order awarding Mother's parents and Appellant joint legal custody of the child, and its October 2019 order awarding Appellant sole legal custody are attached to Appellant's termination petition. So too does the trial court begin its discussion of this ground by asking "Was the child removed by a juvenile court more than six months ago?" and finding that he was. The dispositive question, then, is whether the removal orders were based on allegations of dependency and neglect.[13]

The juvenile court orders indicate that the matter came to be heard upon the "Emergency Petition" of Mother's parents. However, the petition is not in the record so that we might review its underlying allegations. Under similar circumstances, this Court has compared the statutory definition of a dependent and neglected child to the juvenile court's findings in its order removing the child from the parent's home or custody. In *In re Jude M.*, the record contained the juvenile court's order removing the child from the mother's physical and legal custody. 619 S.W.3d at 242. The order indicated that it was heard pursuant to the father's "Petition for Emergency Custody," but the petition itself was not in the record. *Id.* Nor did the order indicate whether the father had explicitly alleged that the child was dependent and neglected. *Id.* This Court compared the juvenile court's finding that the mother "was 'struggling to care for herself and the parties' minor child' and that she did 'not have a stable residence and [was] unemployed' such that she could not 'provide for the child financially'" to the definition of a dependent and neglected child found in Tennessee Code Annotated section 37-1-102(b)(13). *Id.* at 242–43. We found that this language could have brought the child within two aspects of the dependent and neglected definition, but that it was "not discernable from the juvenile court's orders" whether the child's removal from the mother's custody was related to allegations of dependency and neglect. *Id.* at 243–44. Accordingly, the persistence of conditions ground was not applicable to the case, and the trial court's ruling as to the ground was reversed. *Id.* at 244.

Similarly, the juvenile court order in *In re Tiffany B.* provided that the parties agreed that the child remaining in the petitioners' custody was in the best interest of the child, but contained "no mention of dependency and neglect, the statutory code section addressing dependency and neglect, or any findings of wrongdoing by [the f]ather." No. E2020-00854-COA-R3-PT, 2021 WL 514299, at *5 (Tenn. Ct. App. Feb. 11, 2021). The Court of Appeals found, therefore, that the ground of persistence of conditions was inapplicable because the record did not indicate that the child was removed from the father's custody based on a finding of dependency, neglect, or abuse. *Id.* at *6.

---

[13] We note that neither party has addressed this prerequisite on appeal. However, this Court has been directed to "review whether every element of a statutory ground for termination of Mother's parental rights has been met." *In re Jude M.*, 619 S.W.3d 224, 242 (Tenn. Ct. App. 2020) (citing *In re Carrington H.*, 483 S.W.3d at 524); *see also In re Makenzie L.*, No. M2014-01081-COA-R3-PT, 2015 WL 3793788, at *12 (Tenn. Ct. App. June 17, 2015) (considering the sufficiency of the removal order although it was not raised as an issue by either party on appeal).

From our review of the record in this case, neither juvenile court order mentions the allegations before the juvenile court and neither order contains a finding that the child was dependent and neglected. More specifically, the orders do not contain any explanation at all as to why the child was removed from Mother's custody.[14] Likewise, Appellant's termination petition contains no mention of dependency and neglect allegations or findings, and asserts as to this aspect of the ground only that "[t]he minor [c]hild has been removed from the home of [Mother] by Order of the Court for a period of six (6) months." Thus, there is no direct reference to dependency and neglect allegations or any findings by the juvenile court in the record for us to compare to the statutory definition of a dependent and neglected child.

We acknowledge that it is possible that the juvenile court orders did indeed stem from allegations of dependency and neglect by Mother's parents. However, Appellant carries the burden of proving each element of the alleged grounds for termination. *See **In re Markus E.***, 671 S.W.3d at 456. Appellant also bears the burden of providing a complete record on appeal. ***Chiozza v. Chiozza***, 315 S.W.3d 482, 489 (Tenn. Ct. App. 2009) ("This Court's review is limited to the appellate record and it is incumbent upon the appellant to provide a record that is adequate." (citing ***Jennings v. Sewell-Allen Piggly Wiggly***, 173 S.W.3d 710 (Tenn. 2005))). The record before us simply does not establish this potential fact and we are unable to assume the existence of facts that do not appear in the record. *See* ***D.W.J.***, 2005 WL 1528367, at *4; ***In re Tiffany B.***, 2021 WL 514299, at *6 (noting that "to the extent a juvenile court did adjudicate the [c]hild dependent, neglected, or abused by [the f]ather in the past, it was incumbent upon [the p]etitioners to provide proof"). The provision of a complete record on appeal is especially critical in cases like this where a party's fundamental constitutional rights are at stake. ***D.W.J.***, 2005 WL 1528367, at *4 ("Having an adequate record on appeal is crucial in any case, but it is particularly essential in a termination case where we are asked to review the decision of a trial court that forever severs the legal bond between [the m]other and her two children."). Because there is no indication that the child was removed "from the home or the physical or legal custody of [Mother] for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child," the ground of persistent conditions is inapplicable to this case. Tenn. Code Ann. § 36-1-113(g)(3)(A). Accordingly, we reverse the trial court's decision as to this ground.

### B. Best Interest

---

[14] The orders indicate that Mother's ability to have unsupervised visitation with the child was predicated on her completion of intensive therapy, and Father's ability to have contact with the child was predicated on his completion of two drug screens. But these conditions are not described as the basis for removing the child from Mother's custody, and like the ***In re Jude M.*** Court, we are unable to discern from these orders whether these requirements were related to allegations of dependency and neglect. 619 S.W.3d at 243–44.

- 15 -

Because we have determined that a statutory ground for terminating Mother's parental rights has been proven, we must now decide if Appellant has proven, by clear and convincing evidence, that termination of Mother's rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). Effective April 22, 2021, the factors that courts should consider in ascertaining the best interest of child include, but are not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of

- 16 -

the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i);[15] *see also* **In re Jackson R.**, No. M2021-01545-COA-R3-PT, 2023 WL 353420, at *9 n.8 (Tenn. Ct. App. Jan. 23, 2023) (noting that "the amended statute applies only to petitions for termination filed on or after April 22, 2021").

"This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." **In re M.A.R.**, 183 S.W.3d at 667 (citations omitted). Similarly, determining a child's best interest does not entail simply conducting "a rote examination" of each factor and then totaling the number of factors that weigh for or against termination. **In re Audrey S.**, 182 S.W.3d at 878. Instead, the "relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing **White**, 171 S.W.3d at 194). Moreover, "courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective." **In re Gabriella D.**, 531 S.W.3d 662, 681 (Tenn. 2017) (quoting **In re Audrey S.**, 182 S.W.3d at 878). Thus, "[w]hen the best interest of the child and those of the adults are in conflict, such conflict shall always be resolved to

---

[15] Multiple edits have since been made to section 36-1-113, without affecting subsection (i) and the best interest factors.

favor the rights and the best interests of the child." Tenn. Code Ann. § 36-1-101(d). After considering the relevant factors and the ultimate effect termination would have on the child's life, the trial court found that the termination of Mother's parental rights was not in the child's best interest. This Court agrees.

We look first to those factors related to the child's emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(A) (involving the effect of termination on the child's need for stability), (B) (involving the effect of a change in caretakers on the child's well-being), (D) (involving the security of the parent-child attachment), (E) (involving visitation), (H) (involving the child's attachment to another parent-figure), (I) (involving the child's other interpersonal attachments) (T) (involving the effect of the parent's mental and emotional fitness on the child). The proof as to this group of factors was not clearly either for or against termination. That the child has a healthy parental attachment to Appellant is obvious, but the child also has an attachment to and relationship with Mother, which has been fostered by Mother's visitation throughout the custodial period. Appellant's mother and friends are involved in the child's life, but Appellant has shown that she no longer intends to foster the previously-established relationship between the child and Mother's older child. The child has a stable home with Appellant, while there are real concerns regarding the stability of Mother's housing and transportation arrangements. Yet there are also concerns regarding the effect on the child's sense of stability of Appellant introducing the child to different partners. Although the trial court did not directly address the effect of Mother's mental and emotional fitness on the child, the juvenile court clearly thought that Mother would benefit from intensive therapy, which Mother admits she did not complete. However, Mother has attended some therapy and has undisputedly created distance from Father, whose emotional abuse was at the root of the juvenile court's recommendation. When the proof as to a factor both favors and disfavors termination, the factor is considered neutral. *See **In re Clara A.**,* No. E2022-00552-COA-R3-PT, 2023 WL 1433624, at*10 n.15 (Tenn. Ct. App. Feb. 1, 2023) (citing ***In re Josie G.**,* No. E2021-01516-COA-R3-PT, 2022 WL 4241987, at *18– 19 (Tenn. Ct. App. Sept. 15, 2022)). The trial court found that there was no proof as to the effect of termination on the child's well-being. When there is no proof regarding a factor, that factor weighs against termination. *See, e.g.*, ***In re Jayda J.**,* No. M2020-01309-COA-R3-PT, 2021 WL 3076770, at *28 (Tenn. Ct. App. July 21, 2021) (holding that because no evidence was presented as to a factor, the factor weighed against termination); ***In re Taylor B.W.**,* 397 S.W.3d 105, 113 (Tenn. 2013) (affirming the holding that the absence of proof as to a factor meant the factor did not favor termination). On balance, then, these factors do not provide clear and convincing support for termination of Mother's parental rights.

Next, we address those factors involving the physical environment of the child and the parent. *See* Tenn. Code Ann. § 36-1-113(i)(F) (involving the child's fear of the parent's home), (G) (involving whether the child's trauma is triggered by being in the parent's home), (N) (involving any abuse or neglect present in the parent's home by the parent or others residing there), (O) (involving the parent's prior provision of safe and stable care to any child), (Q) (involving the parent's commitment to having a home that meets the child's

- 18 -

needs), (R) (involving the health and safety of the home). Again, there was no proof as to whether the child was fearful of living in Mother's home, which weighs against termination. *See* **In re Jayda J.**, 2021 WL 3076770, at *28. Nor was there evidence that the child had trauma that was exacerbated by being in Mother's home, and as discussed *supra*, the record does not contain any formal allegations of neglect or abuse by Mother. While noting that neither party had a perfect home, the trial court credited Mother for her past ability to parent and Appellant for her current ability to parent. Still, Mother is not yet in a position to be able to maintain a home in which the child can thrive. This was further examined in the trial court's discussion of its concerns regarding the parties' environments. The trial court explained that there was "just a lot of troubling stuff in this case[,]" including Appellant's cavalier attitude toward introducing the child to her romantic partners. The child has clearly bonded with some of these partners, calling them "Dad" only for them to no longer be in the child's life. Moreover, although Appellant denies that the child was present in the vehicle when the firearm went off, at the very least, Appellant's current partner has shown lax firearm safety that could potentially pose a risk to the child's well-being in the future. Specifically, the trial court found that "it's kind of like a work in progress on both sides." So these factors, considered as a whole, do not weigh in favor of termination.

We next turn to those factors concerning the efforts made by the parent. *See* Tenn. Code Ann. § 36-1-113(i)(C) (involving the parent's continuity in meeting the child's needs), (J) (involving the parent's lasting adjustment of circumstances), (K) (involving the parent's use of available resources), (M) (involving the parent's sense of urgency), (P) (involving the parent's understanding of the child's basic needs).[16] The trial court found that while Mother should be credited for completing a parenting program and having the support of the GAL, there was also room for criticism of Mother's utilization of the resources available to her. And both parties have shown an understanding of the child's basic needs. Thus "the proof establishing the positive aspect of the factors was evenly matched by the proof of the negative[,]" and these factors are neutral. **In re Clara A.**, 2023 WL 1433624, at*10 n.15. However, neither party disputes the trial court's finding that Mother's lack of continuity or urgency in meeting the child's needs favors termination. Although the trial court primarily relied upon its earlier finding of a persistence of conditions in determining that Mother had not made a lasting adjustment of circumstances, we agree that it is difficult to address any lasting change in Mother's circumstances, as Mother has had multiple residences, jobs, and vehicles since even the filing of the termination petition. Thus, together this group of factors supports termination.

The final factor involves "[w]hether the parent has consistently provided more than token support for the child." Tenn. Code Ann. § 36-1-113(i)(S). The trial court did not

---

[16] Among these factors is also factor (L), involving reasonable efforts to assist the parent by the Tennessee Department of Children's Services. The trial court found that this factor was immaterial because the child was never in state custody. Neither party disputes this finding.

- 19 -

make an express finding as to this factor when discussing the best interest of the child. However, the trial court found that Mother's failure to provide more than token support was a ground for terminating her parental rights. As discussed, *supra*, the record supports this finding. So this factor also favors termination.

On the whole, then, six factors favor termination, six factors disfavor termination, and seven factors are neutral in our consideration. While determination of the child's best interest may not be reduced to a simple tallying of the factors for and against termination, *see In re Audrey S.*, 182 S.W.3d at 878, especially considering the similarities between the factors, we agree with the trial court that, based on these findings, the proof is not clear and convincing that termination of Mother's parental rights is in the child's best interest. Indeed, from our review, we agree with the trial court's assessment that terminating Mother's rights to place the child into Appellant's full custody would not result in a significantly improved position. While it is never our intention to compare the depth of the parties' pockets in determining the child's best interest, in this case there is very little distinguishing the parties' circumstances. Respectfully, both parties are currently unmarried and do not own their own homes. Mother is currently living with a roommate and her child, and while she is employed, her testimony revealed that after covering her expenses there is left little of her paycheck. We acknowledge that Mother is not currently in a position to regain custody of the child and that, at this time, we are unable to determine whether the concerns as to her housing stability have been assuaged. But this does not establish a complete inability to parent. *See In re Jacobe M.J.*, 434 S.W.3d at 572–73 ("Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. (citing *In re Audrey S.*, 182 S.W.3d at 877)).

On the other hand, Appellant lives and shares expenses with her mother, and she is currently working two jobs while on medical leave from her preferred employment.[17] There remain misgivings about the effect of Appellant's romantic relationships on the child's well-being and sense of stability. And this Court is particularly apprehensive of the fact that Appellant appears unwilling to foster a relationship between the child and his sibling. No reasonable justification has been provided for Appellant restricting the child from any contact with Mother's older child, which appears to stem from the dissolution of Appellant's relationship with that child's father. This fairly hostile approach to the biological family of the child in her care does not bode well for Appellant's testimony that she would be willing to potentially allow Mother to be in the child's life in the future, if the petition were granted.

Moreover, the child has a bond with Mother at present. He knows who she is, and aside from his playing somewhat more aggressively at his therapist's office as a result of

---

[17] To be clear, the record contains no argument that Appellant is unable to financially provide for the child.

the tension between the parties, there is nothing in the record to indicate that the child has a negative response to interacting with Mother. Additionally, the GAL recommended that the trial court not terminate Mother's rights at trial and joined Mother's brief on appeal. In our view, this reveals the strength of the child's attachment to Mother. Termination would therefore interfere with the factor regularly considered one of the most important in our best interest analysis: the existence of a meaningful relationship between the parent and child. *Cf.* **In re Addalyne S.**, 556 S.W.3d at 795–96 (("This Court has previously indicated that in some cases the lack of a meaningful relationship between a parent and child is the most important factor[.]"); **In re Jaydin A.**, No. M2018-02145-COA-R3-PT, 2019 WL 6770494, at *8 (Tenn. Ct. App. Dec. 12, 2019) ("Although no proof was specifically presented that a change in caretakers would be harmful to the child, common sense dictates that removing a child from the only family she has ever known and placing her with a stranger who has historically chosen to put his own desires ahead of the child's needs would cause harm to the child."). Accordingly, terminating Mother's parental rights would not significantly improve his circumstances while also removing an adult who loves and is loved by the child from his life.

Again, parental rights represent a fundamental liberty interest, the termination of which requires the petitioner to meet the "heightened standard of proof" of clear and convincing evidence. **In re Carrington H.**, 483 S.W.3d at 522. "'Clear and convincing evidence' is 'evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" **In re Valentine**, 79 S.W.3d at 546 (quoting **Hodges v. S.C. Toof & Co.**, 833 S.W.2d 896, 901 n.3 (Tenn.1992)). From all of the above, it is clear that serious doubt exists as to Appellant's argument that termination of Mother's parental rights is in the child's best interest, and thus, the clear and convincing standard has not been met. We accordingly affirm the trial court's ultimate decision to dismiss the termination petition.

## V. Conclusion

The judgment of the Greene County Chancery Court is therefore affirmed in part and reversed in part, and this cause is remanded to the trial court for further proceedings consistent with this Opinion. Costs of this appeal are taxed to Appellant Ashley L.F., for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE